



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

3-10CV1896-K

| | | |
|---|---|---|
| UNDER SEAL, | § | Civil Action No. _____ |
| | § | |
| Plaintiffs, | § | |
| | § | RELATORS' COMPLAINT |
| | § | PURSUANT TO |
| v. | § | 31 U.S.C. §§ 3729-3732, |
| | § | FALSE CLAIMS ACT |
| UNDER SEAL, | § | |
| | § | JURY TRIAL DEMANDED |
| Defendants. | § | |

RELATORS' COMPLAINT

# FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** §<br>**ex rel. Michael Robinson and** §<br>**Hannes Robinson, and** §<br>**Michael Robinson and** §<br>**Hannes Robinson Individually,** §<br> §<br>**And** §<br> §<br>**State of California** §<br>**ex rel. Michael Robinson and** §<br>**Hannes Robinson, and Michael Robinson** §<br>**and Hannes Robinson Individually,** §<br> §<br>**And** §<br> §<br>**State of Florida** §<br>**ex rel. Michael Robinson and** §<br>**Hannes Robinson, and Michael Robinson** §<br>**and Hannes Robinson Individually,** §<br> §<br>**And** §<br> §<br>**State of Georgia** §<br>**ex rel. Michael Robinson and** §<br>**Hannes Robinson, and Michael Robinson** §<br>**And Hannes Robinson Individually,** §<br> §<br>**And** §<br> §<br>**State of Illinois** §<br>**ex rel. Michael Robinson and** §<br>**Hannes Robinson, and Michael Robinson** §<br>**And Hannes Robinson Individually,** §<br> §<br>**And** §<br> §<br>**State of Indiana** §<br>**ex rel. Michael Robinson and** §<br>**Hannes Robinson, and Michael Robinson** §<br>**And Hannes Robinson Individually,** §<br> § | **Civil Action No. _____**<br><br><br>**RELATORS' COMPLAINT**<br>**PURSUANT TO**<br>**31 U.S.C. §§ 3729-3732,**<br>**FALSE CLAIMS ACT**<br>**AND STATE FALSE CLAIMS ACTS**<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED UNDER SEAL**<br><br>**DO NOT ENTER IN PACER**<br><br>**DO NOT PUT IN PRESS BOX** |

**COMPLAINT**                                                                   2

And                                                    §
                                                       §
**Commonwealth of Massachusetts**                      §
ex rel. Michael Robinson and                           §
Hannes Robinson, and Michael Robinson §
And Hannes Robinson Individually,                      §
                                                       §
         And                                           §
                                                       §
**State of Michigan**                                  §
ex rel. Michael Robinson and                           §
Hannes Robinson, and Michael Robinson §
And Hannes Robinson Individually,                      §
                                                       §
         And                                           §
                                                       §
**State of New Hampshire**                             §
ex rel. Michael Robinson and                           §
Hannes Robinson, and Michael Robinson §
And Hannes Robinson Individually,                      §
                                                       §
         And                                           §
                                                       §
**State of New Jersey**                                §
ex rel. Michael Robinson and                           §
Hannes Robinson, and Michael Robinson §
And Hannes Robinson Individually,                      §
                                                       §
         And                                           §
                                                       §
**State of Oklahoma**                                  §
ex rel. Michael Robinson and                           §
Hannes Robinson, and Michael Robinson §
And Hannes Robinson Individually,                      §
                                                       §
         And                                           §
                                                       §
**State of Tennessee**                                 §
ex rel. Michael Robinson and                           §
Hannes Robinson, and Michael Robinson §
And Hannes Robinson Individually,                      §
                                                       §
         And                                           §
                                                       §
**State of Texas**                                     §
ex rel. Michael Robinson and                           §

**COMPLAINT**                                          3

| | |
|---|---|
| **Hannes Robinson, and Michael Robinson** | § |
| **And Hannes Robinson Individually,** | § |
| | § |
| **And** | § |
| | § |
| | § |
| **Commonwealth of Virginia** | § |
| **ex rel. Michael Robinson and** | § |
| **Hannes Robinson, and Michael Robinson** | § |
| **And Hannes Robinson Individually,** | § |
| | § |
| **And** | § |
| | § |
| | § |
| **State of Wisconsin** | § |
| **ex rel. Michael Robinson and** | § |
| **Hannes Robinson, and Michael Robinson** | § |
| **And Hannes Robinson Individually,** | § |
| | § |
| **Plaintiffs,** | § |
| | § |
| **v.** | § |
| | § |
| **Bayer HealthCare Pharmaceuticals, Inc.,** | § |
| **and Talecris BioTherapeutics, Inc.,** | § |
| | § |
| **Defendants.** | § |

## RELATORS' COMPLAINT PURSUANT TO
## 31 U.S.C. §§ 3729-3732, FALSE CLAIMS ACT
## AND STATE AND CITY FALSE CLAIMS ACTS

The United States of America, the State of California, the State of Florida, the State of

Georgia, the State of Illinois, the State of Indiana, the Commonwealth of Massachusetts, the

State of Michigan, the State of New Hampshire, the State of New Jersey, the State of Oklahoma,

the State of Tennessee, the State of Texas, the Commonwealth of Virginia, and the State of

Wisconsin, by and through *qui tam* Relators, Michael Robinson ("M.Robinson") and Hannes

("John") Robinson ("H.Robinson") ("Relators"), bring this action under 31 U.S.C. §§ 3729-3732

("False Claims Act") to recover all damages, penalties and other remedies established by the

False Claims Act on behalf of the United States and both Relators. As set forth below,

**COMPLAINT**                                                                                  4

Defendants' acts also constitute violations of the California False Claims Act, Cal. Govt. Code §

12650 et seq.; the Florida False Claims Act, Fla. Stat. Ann. § 68.081 et seq.; the Georgia False

Medicaid Claims Act, Ga. Code § 49-4-168.1 et seq.; the Illinois Whistleblower Reward and

Protection Act, 740 Ill. Comp. Stat. § 175/1 et seq.; Indiana Code § 5-11-5.5; the Massachusetts

False Claims Law, Mass. Gen. Laws Ch. 12 § 5 et seq.; the Michigan Medicaid False Claims

Act, Mich. Comp. Laws. § 400.601 et seq.; the New Hampshire False Claims Act, N.H. Rev.

Stat. Ann. § 167:61 et seq.; the New Jersey Medicaid False Claims Act, N.J. Stat. § 2A:32C-3,

et seq.; the Oklahoma Medicaid False Claims Act, Okla. Stat. § 5053.1 et seq.; the Tennessee

False Claims Act and Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 4 18 101 et seq.

and § 71 5 181 et seq.; Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §

36.001 et seq.; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01 216.1 et seq.;

the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 et seq.  In support,

Relators  would show the Court as follows:

## I.    RELATORS

1.      Relators are Michael Robinson and Hannes Robinson.  M.Robinson has been a

pharmaceutical and medical device salesman for the majority of his working life.  For

approximately 15 years he owned a medical device distribution company; M.Robinson is

familiar with procedures and practices in both the medical device and pharmaceutical

distribution industries.

2.      Beginning in 2008 M.Robinson was an advisor to American Cardiovascular

Consultants, LC, ("ACC") a company owned by his brother Hannes Robinson

("H.Robinson").  Over the course of his relationship with that company M.Robinson became

aware, along with his brother H.Robinson, of some of the past product activities of Excim

Trading Corporation ("Excim"), a pharmaceutical distributor with which H.Robinson and ACC had joint ventured in the pharmaceutical industry for many years. Relators learned of Excim's relationship with Bayer Healthcare Pharmaceuticals, and more specifically of its relationship with the Biologicals division of that company ("Bayer"). Relators learned that Bayer failed to disclose to the United States the best price offered to Excim.

3.     Hannes Robinson ("H.Robinson") resides in Sandy, Utah. H.Robinson has a BS in Finance and a JD in Law, both from the University of Utah. H.Robinson was a member of the Utah State Bar for 23 years. H.Robinson functioned as corporate counsel at various times in his career. However, he owned and operated companies in the construction, medical sales and medical service industries for the majority of his working life.

4.     Beginning in 2000, H.Robinson was recruited to assist two other licensed wholesale distribution companies, American Medical Link and Excim, with which he had long business dealings, in their attempts to acquire and sell blood derivative products ["BDP"] from a number of manufacturers. H.Robinson functioned in the role of a broker, factor or agent on many transactions involving product produced by Bayer Healthcare Pharmaceuticals, generally on behalf of Excim Trading Corporation & John Perez, President.

5.     Approximately 4 years after those dealing with Bayer had ended, H.Robinson was prosecuted [with four other distributor employees and officers] by the Department of Justice for his role in an alleged conspiracy to defraud Bayer of money and property by arranging purchase of product from Bayer's international division and selling those products domestically, though H.Robinson had written permission from Bayer's vice president to perform those acts. In essence, Bayer successfully used Excim and other licensed domestic wholesalers as their

"overstock.com" for the purpose of selling off products that Bayer either could not sell or did not wish to sell through its domestic division.

6.      During the course of his prosecution, H.Robinson realized that Bayer's motivation for implicating him and others in this alleged fraud was that, unbeknownst to H.Robinson, Excim, John Perez or any of the other alleged co-conspirators, Bayer had been using their firms' secondary market sales capabilities to quietly dispose of export product in the domestic marketplace as a foolproof and undetectable method of concealing best pricing from the U.S. government.  The result of this knowing concealment was that Bayer dramatically overcharged CMS, Medicare and similarly situated entities whose pricing structure for Bayer products was related in any way to best pricing or other price reporting, and retained those overcharges to the present.  Further, this concealment resulted in Bayer's retention of very large rebate differentials that would otherwise have been delivered by Bayer to U.S. governmental entities in accordance with law.  H.Robinson was an original recipient or originator of many of the documents contained in this disclosure, and was in routine contact with Bayer personnel regarding all aspects of his own and Excim's work on Bayer's behalf.

## II.    DEFENDANTS

7.      On April 1, 2005, **Bayer HealthCare Pharmaceuticals, Inc.** transferred the assets of its worldwide plasma products business to **Talecris BioTherapeutics, Inc.**, a newly formed corporation controlled by affiliates of Cerberus Capital Management, L.P., New York, and Ampersand Ventures, Wellesley, Massachusetts.  Bayer retained a ten percent equity interest in **Talecris BioTherapeutics Holdings Corp.**, the parent company of **Talecris BioTherapeutics, Inc.** All Bayer plasma activities in the United States were transferred to Talecris, with headquarters in Triangle Park, N.C.  In most other countries in which Bayer had

**COMPLAINT**                                                                                          7

been distributing plasma products, Bayer companies continued to distribute plasma products on behalf of Talecris. Bayer and Talecris have also entered into several service and supply arrangements. The allegations herein describe conduct of Bayer from 2000 through the present and of Talecris from 2005 through the present.

8.     The recombinant factor VIII business, comprising the Kogenate® product line for the treatment of hemophilia A, was not part of the transaction and remains in Bayer HealthCare's portfolio. Kogenate® is one of the most valuable and strategically important products in the Bayer HealthCare portfolio. It is integral to Bayer's long-term strategy allowing it to build on its leadership position in the global hemophilia market.

## III.     RELEVANT DATES

9.     The relevant dates when Bayer charged Excim low prices not disclosed to the United States run from approximately January 1, 2000 through January 1, 2005.  On information and belief, the conduct that is the subject of this complaint continued through at least early or mid-2009 or through the present time.

## IV.     SUMMARY OF ISSUES

10.     This Complaint relates specifically to:

1.     Bayer's sophisticated methods of defrauding Government purchasers—including Medicare, state Medicaid programs (including Puerto Rico's), and all GSA and governmental or quasi-governmental purchasers, such as military hospitals, veteran's hospitals, public health systems such as those that serve the reservation-based Native American Indians, the Pentagon as it relates to all military product purchases, Tricare [government healthcare insurance], and organizations such as CARE and the Job Corps, which

**COMPLAINT**                                                     **8**

provide healthcare services paid for by taxpayer dollars—of all of Bayer's Biological products from 2000 through 2010, and the continuation of this conduct by Talecris.

2.  Bayer's extraordinary efforts to conceal lowest price and to "market the spread" between purchaser price and the significant and undisclosed amount the purchaser would be reimbursed by Medicaid, through rather novel and unique methods virtually impossible for the federal government to detect, and the continuation of this conduct by Talecris.

3.  Bayer's and Talecris's effective concealment of best price and Bayer's apparent breaches of multiple prior governmental stipulation and settlement agreements coupled with breaches of their attendant corporate integrity agreements executed in 1/2001 and 4/2003.

## V.   HISTORICAL BACKDROP

### A.   BAYER'S PRIOR CORPORATE INTEGRITY AGREEMENTS

11.  In 1995, Bayer was sued in a *qui tam* action for marketing the spread and concealment of best pricing; this case was settled January 2, 2001 for $14 million. The action involved three products Bayer sold to Excim from 2000 through 2005, specifically Koate-HP, Gammimmune, and Kogenate, which are widely used in treating hemophilia and immune deficiency diseases. In addition to the monetary settlement, Bayer reached a five-year agreement with the Department of Health and Human Services' Office of the Inspector General that the company's conduct would be monitored by the government under a corporate integrity agreement.

**COMPLAINT**                                                      9

12.     Bayer was sued in a *qui tam* action in 1999 for selling at deep discounts to Kaiser, failing to report the deeply discounted pricing on two drugs under their lowest and best price reporting obligations to the US government, and using fraudulent "private product labeling" to conceal the scheme. **See EXHIBIT X.**

13.     Ultimately this case was settled in 2003 for $257 million, with a company-wide stipulation as to conduct that will preclude any product from being sold without reporting under lowest and best price GSA obligations. The settlement includes a corporate integrity agreement covering Bayer Healthcare Pharmaceuticals, the parent of Bayer Biologicals [the division through which Excim bought products].

14.     Bayer Corp. paid $257,200,000 to settle Medicaid fraud charges involving a "lick and stick" scheme in which Bayer sold re-labeled products to an HMO at deeply discounted prices, and then concealed this price discount in order to avoid paying rebates to the government. $143 million of the Bayer settlement went to resolve a whistleblower's allegations that Bayer defrauded the Medicaid and Public Health Service programs by relabeling products sold to a health maintenance organization at deeply discounted rates and then concealing the discounts to avoid paying rebates, in violation of the Medicaid Rebate program. In addition, Bayer paid $108 million to reimburse state Medicaid programs for the same conduct. An additional $5.5 million criminal fine was also levied.

15.     Bayer may have violated two additional corporate integrity agreements and settlement stipulations from January, 2001 [covering 3 product groups listed in this action] and April, 2003 [not covering any product groups listed in this action].

**COMPLAINT**                                                          10

## B.   BAYER'S RELATIONSHIP WITH EXCIM

16.    In mid-2000 Bayer and Excim agreed to enter into a distribution

relationship.  There were no contracts; Bayer had no obligation to sell, and Excim had no

obligation to buy.  The sales to Excim were through the international division of Bayer

Biologicals, and Excim was told it could sell the product anywhere it wished, including the U.S.,

although the products were ostensibly intended for sale outside the U.S.

## C.   RELEVANT PRODUCTS

17.    The products sold by Bayer to Excim included all of the items sold by the Bayer

Healthcare Pharmaceutical Biological Division.

18.    These items included, but were not limited to all of the NDC codes and

formulations, concentrations and sizes relating to the following blood products:

1.    BayTet

2.    BayRho-D

3.    BayHep

4.    BayRab and all other hyperimmunes from the Bayer and Talecris biological lines

5.    Gammimune SD and non-SD, Gamunex, and all other varieties of liquid intravenous immune globulins from the Bayer and Talecris biological lines

6.    Plasbumin

7.    Plasmanate

8.    Koate of all types (hemophilia factor VIII product for clotting)

9.    Kogenate of all types (hemophilia factor VIII product for clotting)

10.    BayGam, and all other intramuscular immune globulins from the Bayer and Talecris biological lines

**COMPLAINT**                                                        **11**

11.    Albumins of all types

12.    all other products contained in the Bayer and Talecris biological
lines

19.    The products generally shared several characteristics:

- Many items Bayer sold to Excim could not be sold internationally, i.e.,
outside the United States. This is due to the fact that by the time a product
is approved by the FDA, the product has generally been available
internationally for several years. Therefore, if a product has been
outmoded, superseded, or otherwise deemphasized in the United States, it
has likely been outmoded, superseded, or otherwise deemphasized
internationally for years. In addition, due to foreign customs processing
times, foreign governmental product testing times and other market
factors, foreign distributors & consumers will not accept product with
datings which could readily be sold domestically.

- International prices for pharmaceuticals are often lower than domestic
prices. However, Bayer was unwilling to sell internationally saleable
product at lower international prices. As a result, all of the products that
Bayer sold to Excim were sold at prices that were too high for Excim to
distribute the product internationally. The international markets could
simply not support the higher pricing imposed by Bayer.

- Some of the items had been "deemphasized" in the U.S. domestic
market. Though they were the biological equivalent of current U.S.
products, were authorized for Medicare/Medicaid and other
reimbursements at the same prices as their "emphasized" counterparts, and

**COMPLAINT**              12

were fully legal for US sale, the Bayer domestic sales force was not permitted to sell them domestically based on marketing and sales directives.

- Most of the items were currently sold by the Bayer domestic sales force, but could not be sold at domestic price points because of competitive market factors, and were therefore transferred to the international division for destruction and write off.

- Though unknown to Excim during the time it was purchasing and distributing Bayer products, these products were routinely sold to them far below domestic prices reported to the U.S. government and agencies. These "lowest prices" were not reported to CMS, HHS, GSA or any other governmental entity during the period the sales continued, resulting in massive overcharges that have been retained by Bayer and its successor[s] till this day.

## D. NOTIFICATIONS TO BAYER

20.    Beginning in July, 2000, early in Excim's relationship with Bayer, multiple Bayer VPs were fully aware that Excim was selling "export only" domestically, and ignored that information. Three Bayer VP's and various other personnel were notified and involved in discussions of this issue. The notifications were ignored by all Bayer personnel, and Excim was in fact asked to move much more product than it was currently moving.  See **EXHIBIT C.**

21.    One of Excim's customers was Martin Bradley, BioMed Plus, Miami, a national distributor with offices in multiple states.

22.     Beginning in September, 2000, various independent third parties notified multiple Bayer VP's of the domestic sales activities of Excim. The notifications regarding domestic sales of export products were ignored by all Bayer personnel. **See EXHIBIT D.**

23.     Beginning in December, 2000, an independent third party notified a Bayer VP and several other Bayer personnel that Excim had been identified as the only possible source of certain export product, 5% liquid intravenous immune globulin, being sold domestically. **See EXHIBITS E, E-2.** The head of Bayer security was informed of this problem by the FDA Special Operations group, and notified his VPs of the domestic sale of the export product. The product was known to be an export-only product because it was a five percent concentration, which Bayer had discontinued selling domestically [though it was still fully legal for sale and Medicare/Medicaid reimbursement]. Instead, the new and improved ten percent formulation was sold domestically. The notifications regarding domestic sales of export products were ignored by all Bayer personnel. **See EXHIBIT E-2.**

24.     In February of 2002, the Florida Department of Health audited Excim, and noted purchase invoices from Bayer marked "export" although all Excim sales of Bayer products to its customers were domestic. **See EXHIBIT F.**

25.     The Florida Department of Health sent Bayer copies of Excim's export purchase and domestic sale invoices, requesting specific information from Bayer regarding the legitimacy of Excim selling export product domestically, after conversing with Export Compliance Officer Buchanan and Senior Director of Regulatory Affairs Lamb. **See EXHIBITS G, M, N (Buchanan was also Manager, International Customer Service & Distribution.).**

26.     Bayer's response to the Florida Department of Health's inquiry was in writing, signed by Bayer's VP of Worldwide Regulatory Affairs, and asserted that:

**COMPLAINT**                                                          14

1.   all of the products sold to Excim under export invoices were legal for US sale;

2.   all of the products sold to Excim under export invoices were National Drug Code ("NDC") coded, and approved by the FDA for sale in the United States;

3.   as to all products sold to Excim under export invoices "there are no restrictions, contractual or otherwise for the wholesale distribution in the United States" despite the fact that they were invoiced to Excim "for export" only; and

4.   there were no significant price differences between products intended for export and domestic use.  **See EXHIBIT G ("No Restrictions Letter").**

Bayer's written response convinced the Florida Department of Health which terminated its investigation, reassured Excim that its domestic sales were lawful.  The response was also transmitted to some of Excim's customers who asked for verification of the legitimacy of the sales; one of these customers was BioMed Plus.

27.   Documents attached hereto as **EXHIBIT H** show that whatever country designation was put on Excim invoices [this was done at Bayer's, not Excim's, direction], that invoice designation was not followed in Bayer's internal accounting.  Although Bayer apparently allocated purchases on their Excim invoices to country codes relating to Africa and the Middle East, such sales were booked internally to Slovakia.

28.   Documents attached as **EXHIBIT I** are third-party [national wholesaler] and Bayer field personnel notifications to multiple Bayer VP's and other senior Bayer managers, including its deputy director, complete with lot numbers traceable to Excim, that products only

sold through the international division [and not sold by the domestic division] were readily available in the US. Documents attached as **EXHIBIT J** are multiple third-party [national wholesaler] notifications to Bayer's deputy director and numerous other Bayer officials of domestic sales of export products, complete with lot numbers traceable to Excim. The notifications regarding domestic sales of export products were ignored by all Bayer personnel.

### E.     NOTIFICATIONS IGNORED BY BAYER

29.     Documents attached hereto as **EXHIBIT K** are multiple documents among two Bayer VP's, counsel, Bayer's domestic controller, and other senior officials involved in the ongoing Bayer scheme to defraud the US government. **EXHIBIT K** shows that Bayer's domestic controller audited BioMed Plus, a domestic purchaser, and found multiple Bayer products sold by Excim there. BioMed Plus's management discussed Excim in some depth, noting the absence of a contract requiring export, and the legitimacy of Excim's sales to BioMed. BioMed had a copy of the March 1, 2002 **No Restrictions Letter** from Bayer to the Florida Department of Health, **EXHIBIT G,** and quoted from it during the discussion with the Bayer auditors.

30.     In **EXHIBIT K,** Bayer's controller:

1.     identifies Excim as the source of the products sold domestically to BioMed Plus,

2.     identifies possible contract issues, [that Excim may not have had, and in fact did not have, a contract requiring it to export the products it purchased],

3.     cites domestic and international pricing differentials on four representative items: Plasmanate, BayTet, BayRab, and 5% Gamimmune,

4.  identifies Excim's pricing as being lower than domestic U.S. pricing on all products,

5.  specifically cited Excim's price from Bayer as being 66% below Bayer's U.S. pricing in one cited product example; conversely, Bayer's domestic U.S. pricing is 300% of Excim's price on one item the controller uses as an example of Bayer's government overcharges, and

6.  fully articulates the issues related to best price reporting raised by Bayer's sales to Excim.

31.  The audit and domestic controller's notifications to various vice presidents were ignored by all Bayer personnel, and Bayer continued to sell to Excim for nearly two more years.

32.  Excim's relationship with Bayer ended in January, 2005.  Excim invoices attached hereto as **EXHIBITS P, Q, R, S, T, and U,** listed on the spreadsheet attached as **EXHIBIT M,** show Bayer's lowest actual domestic sales prices, to the extent they are indicated by Excim's lowest cost.  On information and belief, Bio2000 may have had pricing as low as or lower than Excim's pricing , thus potentially reducing Bayer's "best price" below the pricing at which Bayer sold to Excim.

F.  **SUMMARY OF BAYER'S SCHEME**

1.  **Reporting Obligations**

33.  In order for payment to be available to healthcare providers under Medicare, Medicaid, and other federal and federally funded state programs for a covered drug, the manufacturer of the drug must have entered a rebate agreement with the Secretary of the Department of Health and Human Services (or directly with states as authorized by the Secretary).  42 U.S.C § 1396r-8(a)(1).  Bayer and Talecris have entered such agreements.  The

**COMPLAINT**                                                                17

rebate agreements require the manufacturers to provide periodic rebates to state plans. ).  42

U.S.C § 1396r-8(b)(1). Manufacturers with rebate agreements are obligated to report periodically

to the Secretary, *inter alia,* the average manufacturer price, the manufacturer's best price, the

manufacturer's average sales price. 42 U.S.C § 1396r-8(b)(3).

      34.     Sales outside the United States are not subject to best price reporting.  Bayer

wished to sell excess inventory at higher prices than could be obtained outside the U.S. but lower

than generally prevailing domestic prices while avoiding reporting the lower best and average

prices. To accomplish this, Bayer would sell through its international division but divert the

product from international to domestic sales by delivering the product to domestic distributors

and authorizing them to sell that product domestically.  Bayer falsified its internal records to

avoid discovery of the diverted sales in government audits.  In failing to disclose these best

prices, Bayer caused its reported average and best prices to be false.  The amounts government

programs pay health care providers for covered drugs are based on this information provided by

the drug manufacturers.  Bayer's false reporting caused claims submitted by all healthcare

providers seeking payment for the any of the underreported drugs to be inflated, and thus false

claims.  Bayer engaged in a practice called "marketing the spread" in its diverted domestic sales.

This means that Bayer sells the drug to the healthcare provider at a price lower than the amount

the healthcare provider will be reimbursed by the government; the difference between the

healthcare provider's purchase price and the amount it is paid by the government is called "the

spread." Marketing to healthcare providers the benefit of this extra profit is called "marketing the

spread."  In addition to causing the government to pay too much for every covered prescription

for the diverted drug, Bayer's underreporting reduced the amounts of rebates it was obligated to

pay the states under the reporting statute.

**COMPLAINT**                                                   **18**

**2.    Bayer's Knowledge**

36.    Bayer already knew of its best price reporting duties, having been sued over those issues twice shortly before Excim was recruited to move blood product domestically.

37.    Product that Bayer could not move at domestic price points was transferred to the international division which had no domestic reporting requirements. Throughout the international and domestic divisions, Bayer knew of the domestic best price reporting requirement.  Bayer determined that it was not willing or able to:

1.    sell all production at domestic price points [this was impossible because of competitive market factors],

2.    sell any outmoded or old formulation product openly domestically through their domestic division,

3.    sell any outmoded, short dated or old formulation product internationally,

4.    sell current good dated product not sellable at U.S. price points for the much lower international prices.

38.    Instead, Bayer decided to sell from its international division to domestic wholesalers like Excim, with the oral, course of conduct, and written direction that these domestic distributors could sell any or all of the product domestically. This permitted Bayer to obtain premium pricing over international rates while not disturbing domestic price points, and while totally bypassing the best price reporting requirements used for every Medicare/Medicaid reimbursement and every direct GSA and similarly governed sale.

39.    The magnitude of the fraud on the US government is massive, spanning up to ten or eleven years [2000 - 2010], and with apparently many products sold as cheaply as 1/5th to 1/7th of U.S. government pricing.

**COMPLAINT**                                        19

40.     Bayer had engaged in such conduct before.  In 1998, Bayer terminated a distributer of its product, AML, due to their domestic sale of export product.  However, John Cutter, a Bayer senior level manager who was recently sentenced in connection with conduct related to a different scheme, stated in his Sentencing Memo that Bayer had reinstated AML as a distributer, even though AML was known to sell export products domestically.  This was done over the objections of Cutter to Bayer VP Chris Smith that there was a risk of domestic diversion of product supplied to AML because there was no guarantee that the product would be exported.  **See EXHIBITS A, B, O at 6-9**.  Cutter further stated  (1) that there were no losses to Bayer; (2) that all the business was profitable to Bayer; and (3) that various classes of product sold to Excim could not be sold elsewhere, and would have otherwise been destroyed and written off, making those sales to Excim clear profit to Bayer.

41.     On all occasions when domestic sales of international product were reported to the VP Chris Smith, he (1) dismissed the information, and stated (2) that there were no losses to Bayer; (3) that all the business was profitable to Bayer; and (4) that various classes of product sold to Excim would have otherwise been destroyed and written off, making those sales clear profit.

42.     VP Smith specifically instructed his division that no one was to interfere with the domestic sale of export products.

## VI.     CAUSES OF ACTION

### COUNT 1

### Federal False Claims 31 U.S.C. § 3729(a)(1)(A)

43.     Relators reallege and hereby incorporate by reference each and every allegation contained in the preceding paragraphs numbered 1 through 38 of this complaint.

**COMPLAINT**                                                                                          **20**

44.     Based on the acts described above, Defendants knowingly caused to be presented, to an officer, employee, or agent of the United States false or fraudulent claims for payment or approval. Every claim for payment under Medicare or Medicaid or other Government program(s) for any product for which Defendant(s) had submitted false or incomplete cost information for the relevant reporting period was a false claim Defendants knowingly caused to be presented to the United States.

45.     The United States, unaware of the falsity of these claims and in reliance on the accuracy thereof, approved or paid the false or fraudulent claims caused by Defendant's false average wholesale price and best price reports.

46.     Due to the Defendants' conduct, the United States Government has suffered substantial monetary damages.

## COUNT 2

### Federal False Claims 31 U.S.C. § 3729(a)(1)(B)

47.     Relators reallege and hereby incorporate by reference each and every allegation contained in the preceding paragraphs numbered 1 through 142 of this complaint.

48.     Based on the acts described above, Defendants knowingly made, used, or caused to be made or used, one or more false records or statements material to a false or fraudulent claim. Every claim for payment under Medicare or Medicaid or other Government program(s) for any product for which Defendant(s) had submitted false or incomplete cost information for the relevant reporting period was a false claim Defendants knowingly caused to be presented to the United States.

.       49.     Defendants' false average wholesale price and best price reports were false statements or records material to false or fraudulent claims. Defendants used those statements or

records to get false claims paid to health-care providers, to whom Defendants "marketed the spread" in order to sell their products. The false records and representations were material to the United States' payment of false claims.

50.    The United States, unaware of the falsity of these claims, records, and/or statements made and/or used by the Defendants and in reliance on the accuracy thereof, approved or paid the false or fraudulent claims

51.    Due to the Defendants' conduct, the United States Government has suffered substantial monetary damages.

## COUNT 3

### California False Claims Act
### Cal. Gov't Code §12651(a)(1)-(3)

52.    Relators restate and incorporate each and every allegation above as if the same were fully set forth herein.

53.    This is a claim for treble damages and penalties under the California False Claims Act.

54.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

55.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

56.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

**COMPLAINT**                                                                 22

Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal business practices.

57.     By reason of the Defendant's acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

58.     The State of California is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT 4

### Florida False Claims Act
### Fla. Stat. Ann. §68.082(2)

59.     Relators restate and incorporate each and every allegation above as if the same were fully set forth herein.

60.     This is a claim for treble damages and penalties under the Florida False Claims Act.

61.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

62.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

63.     The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal business practices.

**COMPLAINT**                                                                 23

64. By reason of the Defendant's acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

65. The State of Florida is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT 5

### Georgia False Medicaid Claims Act
### O.C.G.A. §§ 49-4-168 et seq.

66. Relators restate and incorporate each and every allegation above as if the same were fully set forth herein.

67. This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

68. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

69. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

70. The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal business practices.

71. By reason of the Defendant's acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**COMPLAINT**                                                                      24

72.    The State of Georgia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT 6

### Illinois Whistleblower Reward and Protection Act
### 740 Ill. Comp. Stat. §175/3(a)(1)-(3)

73.    Relators restate and incorporate each and every allegation above as if the same were fully set forth herein.

74.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act.

75.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

76.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

77.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal business practices.

78.    By reason of the Defendant's acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**COMPLAINT**                                                     25

79.    The State of Illinois is entitled to the maximum penalty of $11,000 for each and
every false or fraudulent claim, record or statement made, used, presented or caused to be made,
used or presented by Defendant.

**COUNT 7**

**Indiana False Claims and Whistleblower Protection Act**
**I.C. 5-11-5.5**

80.    Relators restate and incorporate each and every allegation above as if the same
were fully set forth herein.

81.    This is a claim for treble damages and penalties under the Indiana False Claims
and Whistleblower Protection Act.

82.    By virtue of the acts described above, Defendant knowingly presented or caused
to be presented, false or fraudulent claims to the Indiana State Government for payment or
approval.

83.    By virtue of the acts described above, Defendant knowingly made, used, or
caused to be made or used false records and statements, and omitted material facts, to induce the
Indiana State Government to approve and pay such false and fraudulent claims.

84.    The Indiana State Government, unaware of the falsity of the records, statements
and claims made, used, presented or caused to be made, used or presented by Defendant, paid
and continues to pay the claims that would not be paid but for Defendant's illegal business
practices.

85.    By reason of the Defendant's acts, the State of Indiana has been damaged, and
continues to be damaged, in a substantial amount to be determined at trial.

86.     The State of Indiana is entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT 8

### Massachusetts False Claims Law
### Mass. Gen. Laws ch. 12 §5B(1)-(3)

87.     Relators restate and incorporate each and every allegation above as if the same were fully set forth herein.

88.     This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

89.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Commonwealth of Massachusetts Government for payment or approval.

90.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Commonwealth of Massachusetts Government to approve and pay such false and fraudulent claims.

91.     The Commonwealth of Massachusetts Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal business practices.

92.     By reason of the Defendant's acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

93.     The Commonwealth of Massachusetts is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT 9

### Michigan Medicaid False Claims Act
### MCL 400.601-400.613

94.     Relators restate and incorporate each and every allegation above as if the same were fully set forth herein.

95.     This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

96.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

97.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

98.     By virtue of the acts described above, Defendant knowingly made, presented, or caused to be presented to the Michigan State Government claims that it knew falsely represented that the goods or services for which the claims were made were medically necessary in accordance with professionally accepted standards.

99.     The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal business practices.

**COMPLAINT**                                                          28

100.   By reason of the Defendant's acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

101.   The State of Michigan is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT 10

### New Hampshire False Claims Act
### N.H. Rev. Stat. Ann. §167:61-b(I)(a), (b), and (e)

102.   Relators restate and incorporate each and every allegation above as if the same were fully set forth herein.

103.   This is a claim for treble damages and penalties under the New Hampshire False Claims Act.

104.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Hampshire State Government for payment or approval.

105.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

106.   The New Hampshire State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal business practices.

107.   By reason of the Defendant's acts, the State of New Hampshire has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

108.    The State of New Hampshire is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT 11

### New Jersey False Claims Act
### N.J. Stat. § 2A: 32C-1 et seq.

109.    Relators restate and incorporate each and every allegation above as if the same were fully set forth herein.

110.    This is a claim for treble damages and penalties under the New Jersey False Claims Act.

111.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

112.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

113.    The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal business practices.

114.    By reason of the Defendant's acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

169    The State of New Jersey is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT 12

### Oklahoma Medicaid False Claims Act
### OKLA. STAT. SEC. 63-5053.1et seq.

170.    Relators restate and incorporate each and every allegation above as if the same were fully set forth herein.

171.    This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

172.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

173.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

174.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal business practices.

175.    By reason of the Defendant's acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

176. The State of Oklahoma is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT 13

### Tennessee Medicaid False Claims Act
### Tenn. Code Ann. §71-5-182(a)(1)

177. Relators restate and incorporate each and every allegation above as if the same were fully set forth herein.

178. This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

179. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

180. The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal business practices.

181. By reason of the Defendant's acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

182. The State of Tennessee is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COMPLAINT**                                         32

## COUNT 14

### Texas Medicaid Fraud Prevention Law
### Tex. Hum. Res. Code Ann. §36.002

183. Relators restate and incorporate each and every allegation above as if the same were fully set forth herein.

184. This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

185. By virtue of the acts described above, Defendant knowingly made or caused to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Texas Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized.

186. By virtue of the acts described above, Defendant knowingly concealed or failed to disclose information that permitted persons to receive benefits or payments under the Texas Medicaid program that are not authorized or that are greater than the benefits or payments that are authorized.

187. By virtue of the acts described above, Defendant knowingly made, caused to be made, induced, or sought to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Texas Medicaid program.

188. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

189.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

190.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal business practices.

191.    By reason of the Defendant's acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

192.    The State of Texas is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT 15

### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §8.01-216.3(a)(1)-(3)

193.    Relators restate and incorporate each and every allegation above as if the same were fully set forth herein.

194.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

195.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Commonwealth of Virginia Government for payment or approval.

**COMPLAINT**                                                                34

196.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Commonwealth of Virginia Government to approve and pay such false and fraudulent claims.

197.     The Commonwealth of Virginia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal business practices.

198.     By reason of the Defendant's acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

199.     The Commonwealth of Virginia is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## COUNT 16

### Wisconsin False Claims For Medical Assistance Act
### Wis. Stat §20.931 et seq.

200.     Relators restate and incorporate each and every allegation above as if the same were fully set forth herein.

201.     This is a claim for treble damages and penalties under the Wisconsin False Claims For Medical Assistance Act.

202.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

**COMPLAINT**                                                             35

203.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Wisconsin State Government to approve and pay such false and fraudulent claims.

204.    The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal business practices.

205.    By reason of the Defendant's acts, the State of Wisconsin has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

206.    The State of Wisconsin is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## VII.    DAMAGES

1.      From 2000 - 2005, **annual,** actual damages resulting from overpayments to Bayer and Bayer's underreported and underpaid rebates should exceed $150,000,000, based upon and extrapolated from CMS data during Excim's relationship with Bayer.

2.      From 2005-2009 the **annual,** actual damages resulting from overpayments to Bayer and Bayer's underreported and underpaid rebates should exceed $150,000,000 during the illicit Talecris [Cutter] relationship with (1) Co A [girlfriend] and (2) Co B [girlfriend], both Talecris distributors replicating the business conducted by Bayer with Excim and other similar distributors through early 2005.

**COMPLAINT**                                                                    36

3.      Fines taken at the lowest level of $5,500 per false claim or retention of a false claim benefit should, on information and belief, likely exceed $100,000,000 per included year. **EXHIBIT W-2.**

4.      Damage documentation to date measured from Excim invoices demonstrates that CMS reimbursements paid inflated prices for Bayer products at between 130% and 493% higher than Excim's acquisition cost from Bayer.   Excim's deeply discounted pricing was not reported as required for Best Price compliance resulting in government overpayments to Bayer / Talecris and underreported and underpaid rebates by Bayer / Talecris.

5.      On information and belief, the range of overcharges for each of the years during which Bayer marketed the spread and concealed best price, Bayer sold export product to Excim for domestic sale at prices that equaled or exceeded the range shown above; specifically, Medicare reimbursements paid between 130% and 493% higher than Excim's acquisition cost from Bayer, without Bayer ever truthfully disclosing the actual price and discount information to the government, resulting in government overpayments to Bayer / Talecris and underreported and underpaid rebates by Bayer / Talecris.

7.      6.      On information or belief, during the period following Excim's relationship with Bayer, Talecris, through Cutter's girlfriend, who had 2 domestic companies approved by Talecris and previously approved by Bayer, continued similar, unlawful domestic sales of export product, just, as Cutter had done while at Bayer; specifically that Talecris continued [2005 – 2009] to conceal the government's right to be reimbursed for the identified products at between 130%

**COMPLAINT**                                                        37

and 493% higher than Talecris' of their real "best price" sales to distributors in the domestic U.S. market. The obligatory Best Price information continued to be withheld from the government, resulting in government overpayments to Bayer / Talecris and underreported and underpaid rebates by Bayer / Talecris. Relators are seeking all damages, fees, costs and penalties available to the United States and Relators under the FCA, as well as on behalf of States possessing relevant qui tam statutes that provide for similar recoveries.

## VIII. <u>PRAYER</u>

1. WHEREFORE, Relators pray for judgment that Defendants cease and desist from violating 31 U.S.C. §3729 *et seq.*, and the equivalent provisions of the state statutes set forth above;

2. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729;

3. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Cal. Govt. Code §12651(a);

4. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Fla. Stat. Ann. §68.082;

5.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of O.C.G.A §§ 49-4-168 *et seq.*;

6.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of 740 Ill. Comp. Stat. §175/3(a);

7.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus civil penalties for each violation of I.C. §5-11-5.5;

8.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Massachusetts has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Mass. Gen. L. Ch. 12 §5B;

9.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Michigan has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of MCL 400.601 *et seq.*;

10.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Hampshire has sustained because of Defendants' actions, plus civil penalties for each violation of N.H. Rev. Stat. Ann. §167:61-b(I);

11.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained because of Defendants' actions, plus civil penalties for each violation of N.J. Stat. §2A:32C-1 *et seq.*;

12.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Oklahoma  has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of 2007 OK. ALS 137;

13.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendants' actions, plus a civil penalty for each violation of Tenn. Code Ann. §71-5-182(a);

14.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of  Tex. Hum. Res. Code Ann. §36.002;

15.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the Commonwealth of Virginia has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Va. Code Ann. §8.01-216.3(a);

16.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages Wisconsin has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Wis. Stat. §20.931 *et seq.*;

17.     that Relators be awarded all costs of this action, including attorneys' fees and expenses;

18.     that Relators recover such other relief as the Court deems just and proper, or that is necessary to make Relators whole.

**COMPLAINT**                                                                 **40**

Dated: September 20, 2010

Respectfully submitted,

_/s/ James B. Helmer, Jr._

James B. Helmer Jr. (*pro hac vice*)
HELMER, MARTINS, RICE, &
POPHAM, CO., Co., L.P.A.
600 Vine Street, Suite 2704
Cincinnati, Ohio 45202
T: (513) 421-2400
F: (513) 421-7902
support@fcalawfirm.com

Samuel L. Boyd (SBN: 022777500)
Catherine C. Jobe (SBN: 10668280)
BOYD & ASSOCIATES, P.C.
6440 N. Central Expressway, Suite 600
Dallas, Texas 75206-4101
T: (214) 696-2300
F: (214) 363-6856
sboyd@boydfirm.com

*Attorneys for Relators/Plaintiffs*

**COMPLAINT**                                      41

## CERTIFICATE OF SERVICE AND DISCLOSURE

On September 9, 2010 e-mail disclosure was served on Ms. Patricia Hanower, U.S Department of Justice, Civil Fraud Division, in Washington, D.C., regarding Relators' intention to file suit and the nature of the claims. On September 13, 2010, prior to the filing of this action, Relators served disclosure of Relators' Disclosure Statement on Ms. Patricia Hanower, by e-mail at Patricia.Hanower@usdoj.gov. On September 16, 2010, at 3:30 p.m. (CDT), Relator's counsel conducted an oral pre-filing disclosure with Ms. Hanower as required by the False Claims Act. On September 20, 2010, the final form of the Disclosure Statement and proposed Complaint were also served, before filing, on Ms. Hanower.

On September 13, 2010, prior to the filing of this action, Relators served disclosure of a copy of Relators' Disclosure Statement on James T. Jacks, United States Attorney for the Northern District of Texas, 1100 Commerce Street, 3rd Floor, Suite 300, Dallas, TX 75242, by e-mail to Sean.Mckenna@usdoj.gov. On September 20, 2010, the final form of the Disclosure Statement and proposed Complaint were emailed, before filing, to Mr. Sean McKenna, Assistant U.S. Attorney for the Northern District of Texas.

On September 13, 2010 prior to the filing of this action, a copy of Relators' Disclosure Statement was formally served pursuant to FRCP 4(i)(1)(b), via Certified Mail, Return Receipt Requested. Again, on September 21, 2010, the final Disclosure Statement and proposed Complaint were also served, before filing, upon:

Eric Holder
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Samuel L. Boyd P.C.